.The State, ex rel. Reed, v. Ramsey.

THE STATE OF NEBRASKA, EX REL. E. S. REED AND OTHERS, v. B. S. RAMSEY AND OTHERS, COUNTY COM- MISSIONERS OF CASS COUNTY.

County Seat: MANDAMUS. At a special election held in the sev- eral precincts of Cass county on the fourteenth day of May, 1878, for the purpose of relocating the county seat of said county, the returns made to the county clerk were canvassed by him and two disinterested freeholders, etc., of said county, summoned by him for that purpose. From which canvass and the return thereof, filed in the county clerk's office, it appears that there were 2,597 votes cast at said election, that 1,061 votes were for Plattsmouth (the present county seat), that 1,538 votes were for places other than Plattsmouth. Relation for peremp- tory mandamus against the defendants requiring them to call a second election for the relocation of said county seat on the ground that 150 illegal votes were cast at said election in Platts- mouth; that as all of the votes cast in Plattsmouth were against relocation, except 18; that deducting 132 votes from all those cast against relocation would leave more than three-fifths of all the votes cast at said election in favor of relocation, and that no one place had received a majority of three-fifths. *Held,* 1. That it was not the duty of the board of county commis- sioners to canvass the vote in such cases. 2. That no power was given by the statute to the canvassers to reject or throw out votes for the reason that persons not resident electors had voted at such election. 3. That mandamus would not lie against the county commissioners, they not being in default.

ORIGINAL application for mandamus.

*J. L. Webster* and *T. B. Stevenson,* for relators.

*Sam M. Chapman,* for respondent.

COBB, J.

An alternative writ of mandamus was issued to the respondents, who constitute the board of county com- missioners of Cass county, reciting that prior to the

fourteenth day of May, 1878, petitions were presented to them, the said board of county commissioners, signed by resident electors of said county equal in number to three-fifths of all the votes cast at the last general election held in said county previous thereto, which said petitions were in conformity in all respects with the law, and which requested them, the said board of commissioners, to call a special election in said county for the purpose of submitting to the qualified electors thereof the question of the relocation of the county seat of said county; that in pursuance thereof a special election was held the fourteenth day of May, 1878, in said county; that the votes cast at said election were duly canvassed by the board of commissioners; that according to said canvass 2,597 votes were cast at said election, of which number 1,059 were for the town of Plattsmouth, which was then the county seat of said county, and that 1,538 votes were cast for relocating said county seat at places other than said Plattsmouth, to-wit:

In favor of Weeping Water............................1391
    "      Weeping Water Falls....................  6
    "      Louisville ......................................  64
    "      Rock Bluffs..................................  36
    "      South Bend..................................  21
    "      Cass Center...................................  4
    "      Sec. 24, Town 11, Range 11.............  11
    "      Sec. 23, Town 11, Range 11.............  3
    "      For relocation...............................  1
    "      Against relocation.........................  2

That according to said canvass there were cast at said special election in Plattsmouth 655 votes, of which votes 637 were in favor of Plattsmouth and 17 votes were in favor of Weeping Water, and one vote in favor of Rock Bluffs as such county seat; that of the votes so cast 150 were illegal, being cast by persons who

were not resident electors of said county of Cass; that whereas all the votes cast in said Plattsmouth were in favor of Plattsmouth, except 17 for Weeping Water and one for Rock Bluffs, therefore at least 132 of said illegal votes were in favor of said Plattsmouth; that deducting said 132 votes from the whole number of votes cast in said county in favor of Plattsmouth and said 18 votes from the whole number of votes cast for places other than Plattsmouth, it appears that three-fifths of all the votes cast at said election by resident voters were in favor of places other than Plattsmouth, where said county seat then was and now is located; that therefore it becomes the duty of them, the said board of county commissioners, to immediately call a special election for a second vote on the question of re-locating said county seat as provided by law, yet that upon demand made in that behalf setting forth in writing the illegal votes as aforesaid, they, the said board of county commissioners, refused and still re-fuse so to do, etc.

The defendants, the county commissioners, returned the alternative writ, and made answer thereto, admitting the facts stated in the alternative writ, also the holding of the election for the re-location of the county seat of Cass county; that said election was held at the time stated in the said writ, and that the whole number of votes cast at said election was 2,597, but averring that at said election said city of Plattsmouth received 1,061 votes, which were cast for said city of Plattsmouth and against the relocation of said county seat; that immediately after said election, and on the 18th day of May, 1878, John D. Tutt, county clerk of said county, together with T. W. Woodford and Isaac Wiles, dis-interested freeholders and resident electors of said county, met together pursuant to the call of said coun-ty clerk, as a board of canvassers in and for said Cass

county, and proceeded to canvass and did canvass all of the votes cast at said special election. And in pursuance of said canvass, officially proved and published the result of said vote, and returned the same to the office of the county clerk in and for Cass county, Nebraska, where the same was duly filed and became a part of the records of said county. A copy of the tabular statement and certificate of said canvassers is attached to the said answer, and averred to be a true statement of the vote cast at said election for the several points therein named, and that the same is correct in every particular. Said answer admits the demand made on the said board on the 9th day of September, 1878, by the relators, with others, demanding of said board that it immediately call a second election for the re-location of said county seat, which was denied by the said board. For a fourth defense the said answer further denies that the said board of county commissioners canvassed the vote cast at said special election, and denies that there were any illegal votes cast at the said election, and they deny that they have any power or authority under the law to order a second election, or do otherwise than follow the result of said official canvass and the result thereof as declared by the board of canvassers, but that by the plain and direct terms of law they are forbidden to call such second election, etc.

And for a fifth defense they say that the said alternative writ does not state facts and ground sufficient to constitute a cause of action against these defendants and in favor of said plaintiffs.

The plaintiff filed a motion to strike out the said fourth and fifth defenses in the said answer, for the reason that the same constitute no defense, and that the same do not state facts sufficient to prevent the issuing of a peremptory writ.

21

The act of February 25, 1875 (Laws, 1875, p. 159), makes no provision for the canvassing of the votes cast for the relocation of a county seat. If such omission is not fatal to the administration of said law, then it must be that the duty of canvassing such vote devolves upon the county clerk and two disinterested electors of the county to be chosen by the clerk for that purpose, as provided by section 17, chapter 20, General Statutes, for canvassing the votes cast at general elections for state and county officers, etc., and no duty in respect thereto is devolved upon the county commissioners, except to act upon the result as the same should be officially declared. It appears as well from the plaintiff's own showing as from the answer of the defendants that their action upon the said result has been in accordance with their plain duty as prescribed by law. They had no control over the canvass or the result, and the statute provides that: "If at either of the elections in this act provided for more than two-fifths of the votes cast shall be in favor of the place where the county seat is then located, the question of relocation thereof shall not be again submitted for the space of two years from the date of said election." Laws, 1875, p. 161.

When the statute speaks of votes it of course means legal votes; but all votes cast and received at an election are presumed to be legal until their illegality is proved in some manner provided by law. Provision is made for contesting the election of persons who may be declared elected to a seat in the senate or house of representatives, or to a state or county office. Whether by following such provisions as near as the same are applicable to an election of this kind the plaintiffs could have so changed the result as to have made it the duty of the county commissioners to call a second election, we do not feel

The State, ex rel. Reed, v. Ramsey.

called upon to decide in disposing of this motion, but it seems very clear that while the result of the canvass remains undisturbed the defendants have no further duty to perform growing out of said special election or the petitions upon which it was called. This would not be different even if the board of county commissioners had canvassed the vote and it had been their duty to do so, as seems to have been thought by the plaintiff. The law nowhere gives the canvassers the right to throw out or reject votes for the reason that they have been cast by persons not legal voters, nor have they any means of ascertaining who were illegal voters or what ballots were cast by them. A standard authority on matters of this character says: "An important feature of the writ of mandamus and one which distinguishes it from many other remedial writs is that it is used merely to compel action and coerce the performance of a pre-existing duty. In no case does it have the effect of creating any new authority or of conferring powers which did not previously exist, its proper function being to set in motion and to compel action with reference to previously existing and clearly defined duties. It is therefore in no sense a creative remedy, and is only used to compel persons to act where it is their plain duty to act without its agency. And it follows necessarily that the writ will not go to command the performance of an act which would be unlawful in the absence of the writ." High on Ex. Leg. Remedies, § 7, p. 10; see also Illinois cases there cited.

Will it be seriously urged that, with the canvass of the said vote standing on the records of Cass county uncontested and unreversed, it is a plain or even a doubtful duty resting on the said board of county commissioners to call said second election? Would it not on the other hand be a clear violation of duty and of

law, and would it not be doing exactly what the law prohibits being done, until after the expiration of two years from the first election?

The difficulty in this case seems to be that nobody has refused to discharge any official duty incumbent upon him under any law, and nobody has violated the law except these illegal voters, if any such there be, and they cannot be reached by mandamus. It has been suggested that it be referred to a referee to take testimony as to the alleged illegal voters and report the same to this court. If that could be done under some appropriate legal proceeding, and a sufficient number of illegal votes proved to change the result, and that evidence and conclusion brought to the attention of the said board of commissioners, and they should refuse to act thereon, then it is possible that mandamus would lie against them. But this court cannot presume that they would refuse to act in such case. "Mandamus is never granted in anticipation of a supposed omission of duty, however strong the presumption may be that the persons whom it is sought to coerce by the writ will refuse to perform their duty when the proper time arrives. It is therefore incumbent upon the relator to show an actual omission on the part of the respondent to perform the required act, and since there can be no omission before the time has arrived for the performance of the duty, the writ will not issue before that time." "In other words the relator must show that the respondent is actually in default in the performance of a legal duty *then* due at his hands, and no threats or predetermination can take the place of such default before the time arrives when the duty should be performed, nor does the law contemplate such a degree of diligence as the performance of a duty not yet due." High on Ex. Leg. Rem., sec. 12, p. 14. See cases there cited.

The State, ex rel. Reed, v. Ramsey.

Let it be supposed that by proceedings in the nature of a contest or some other appropriate proceedings it be decided by some proper tribunal that one hundred and fifty of the votes cast at said election at the polls in Plattsmouth were cast by persons not resident electors of Cass county, as stated in said alternative writ, and such decision of such tribunal be brought to the attention of said board of county commissioners on the 10th day of December, 1878, then what would be the status of the case? It might be that if the said board should refuse or fail to call said second election within a reasonable time after that day that they would be in default. But it could not be that they had been in default ever since the 9th day of September.

The issues in the case must be made upon the facts, rights, and duties of the parties as they existed at the time of the commencement of the suit, or at the latest at the time that they are actually joined; and it is apparent, if the foregoing views are correct, that the issue presented by the alternative writ, tried in view of the duties of the respondents as they existed at the date of its issuance, or at this time, would have to be decided in favor of the respondents.

JUDGMENT ACCORDINGLY.